FILED
CLERK

1:48 pm, Aug 15, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
JOHN PARKER,

<em>Plaintiff</em>,

-against-

OFFICER SANTOS, *Individually and as an Officer attached to the Incorporated Village of Freeport Police Department*, INCORPORATED VILLAGE OF FREEPORT, and INCORPORATED VILLAGE OF FREEPORT POLICE DEPARTMENT,

<em>Defendants</em>.

------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
19-CV-6945 (JS)(JMW)

**A P P E A R A N C E S :**

Gent Disha, Esq.
**Wingate, Russotti, Shapiro, Moses & Halperin, LLP**
420 Lexington Avenue, Suite 2700
New York, NY 10170
*Attorney for Plaintiff*

James M. Murphy, Esq.
**Montfort, Healy, McGuire & Salley**
840 Franklin Avenue
Garden City, NY 11530
*Attorney for Defendants*

**WICKS**, Magistrate Judge:

Plaintiff John Parker ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 asserting (i) violations of his Fourth Amendment rights, (ii) negligence in the hiring, training, discipline and supervision of police officers, and (iii) malicious prosecution against Defendants Officer Santos, Incorporated Village of Freeport (the "Village") and the Incorporated Village of Freeport Police Department ("Freeport PD") (collectively, "Defendants"), arising out of Plaintiff's arrest by Officer Santos and the Freeport PD on August 9, 2018. (ECF No. 1.) On February 15, 2023, the

1

undersigned, who presided over the discovery phase, marked the case as trial ready and returned it to District Judge Joanna Seybert for trial. (ECF No. 34.) On July 26, 2023, a conference was held to discuss Defendants anticipated Motion for Summary Judgment on all Counts. (ECF No. 36.) Now before the Court, on referral from Judge Seybert (*see* Electronic Order dated April 19, 2024), is Defendants' Motion for Summary Judgment which seeks dismissal of the Complaint in its entirety (ECF Nos. 39, 41). The motion is opposed by Plaintiff (ECF No. 40). For the reasons stated herein, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment (ECF No. 39) be **GRANTED** *in part* and **DENIED** *in part*.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.[1] On August 9, 2018, Plaintiff's mother, Theresa Parker, called

---

[1] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.,* No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow,* No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). Further, to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements. *See McFarlane v. Harry's Nurses Registry,* No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh,* 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)). As the Second Circuit has explained, a district court "may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Vt. Teddy Bear Co. v. 1-14 800 BEARGRAM Co.,* 373 F.3d 241, 244 (2d Cir. 2004). "Instead, a district court must satisfy itself 'that the citation to evidence in the record supports the assertion.'" *Elijah Schimkewitsch v. New York Institute of Technology,* No. 23-1022, Summary Order (2d Cir. Aug. 14, 2024) (quoting *Vt. Teddy Bear Co.,* 373 F.3d at 244).

Freeport PD requesting an officer be dispatched to "the cash checking place" at the intersection of Main Street and Sunrise Highway in Freeport Village, New York. (ECF No. 40-7.) Mrs. Parker had just cashed a check from Social Services made payable to herself and Plaintiff's stepson, Kenny Love ("Love"), who had rented a room in Mrs. Parker's house at 121 Lillian Avenue in Freeport. (ECF No. 39-2 at ¶ 4(c)). Out of the $288.00 check, Mrs. Parker claimed $140.00 for herself to cover storage fees, but and his mother Danyelle Greene demanded the full amount. (*Id.* at ¶ 4(d)-(e)). A verbal dispute arose over the $140.00, and Mrs. Parker would not surrender the money. (*Id.* at ¶ 4(e)). By the time officers arrived at Main Street and Sunrise Highway, Mrs. Parker had gone to Freeport PD headquarters and directed law enforcement officers to 121 Lillian Avenue, claiming Ms. Greene, Love, and Plaintiff were in front of her house insisting she forfeit the $140.00. (*Id.* at ¶ 4(g); ECF No. 40-6 at 24.)

The police escorted Mrs. Parker to her home that evening and found an irate Plaintiff who tried to explain the dilemma to responding officers. (ECF Nos. 40-6 at 24.) In the body camera footage, when officers told Plaintiff they were trying to stop an argument, he exclaimed, "There's no reason to stop the argument, she's wrong," and then lurched at Mrs. Parker as she entered her parked car in the driveway, wherein officers stepped in between the two. (ECF No. 40-7.) Leaning against the car's driver-side door, Plaintiff lamented to officers how Mrs. Parker was supposedly taking advantage of Love's previous living situation at her home and repeatedly insisted she was wrong. (*Id.*) Demanding that they make his mother turn over the money, Plaintiff told officers, "If you don't do it, I'm gonna do it," and then asked officers, "You want me to break the f***ing window?" (*Id.*) At this point, Mrs. Parker was seated in her car. (*Id.*) Officers behind the vehicle can be heard saying to one another, "He's gonna break the door, get ready to jump in." (*Id.*) However, in his January 19, 2021 deposition, Plaintiff denied having ever said he would break the

car's window or otherwise damage the vehicle but affirmed that he "was annoyed about the situation." (ECF No. 40-6 at 40.) As bystanders and officers tried to calm Plaintiff down, he shouted, "We could do whatever, I don't give a f*** about you trying to size up on me" to one of the officers straddling the vehicle and then said, "I'm not scared of nothing." (ECF No. 40-7.) Plaintiff eventually left his position next to the car and walked to the end of the driveway, telling officers, "You better call twenty more," as can be heard in the body camera footage. (ECF No. 40-7). While police questioned Mrs. Parker, who was still in her car, Plaintiff shook hands with an officer at the end of the driveway and explained to him, "I'm not scared of nothing, I've been to jail before, I can fight, I don't care about none of that, she wrong," to which the officer responded, "At the same time, we have a job to do, calmly, and we don't need people at a heightened, agitated state." (*Id.*). In his deposition, Plaintiff later denied both saying the police "better call 20 more" and saying that he had been to jail before and could fight. (ECF No. 40-6.)

At the end of the driveway and in the street, officers tried to explain to Plaintiff that, since this was a civil dispute, they could not settle the check distribution. (ECF No. 40-7.) After noting his frustration on the matter, Plaintiff went to talk with the Sergeant, who repeated that it was a civil matter about which the police could do nothing. (ECF Nos. 40-6 at 42). After a few minutes, Plaintiff repositioned himself near the driver-side door where Mrs. Parker was still seated; officers Nardella and Santos were adjacent to the car monitoring the situation. (ECF Nos. 39-8; 39-9; 40-7.) Having approached Mrs. Parker, who was still in her car, Plaintiff insisted to his mother that she was "causing a problem" and demanded the $140.00, while his mother repeatedly asked him to step away from the vehicle. (ECF No. 40-7.) When Mrs. Parker said she was going to take her handbag into her house, Plaintiff retorted, "No the f*** you not coming in there." (ECF No. 40-7.) The two then exchanged some words about a bet over whether Mrs. Parker would in fact make

it to her house. (*Id.*) Plaintiff refused to leave the side of the car, complaining to officers, "She is rolling the window up on my hand," and affirmed, "She not going in the house… She not going in that house." (ECF No. 40-7.) Officers asked Plaintiff to relax and noted that he was "standing on the window." (*Id.*) When Mrs. Parker exhorted her son to move away from the car, Plaintiff replied, "You gonna give the money up. You not stronger than me, dummy." (*Id.*) Mrs. Parker then began her egress from the vehicle, whereupon Plaintiff exclaimed, "You see her pushing the door on me?" (*Id.*) Finally exiting her car, Mrs. Parker says, "Excuse me," to her son and the officers there. (*Id.*) Officers Santos and Nardella were still in position by the car door. (*Id.*).

The parties disagree on the ensuing interaction between Plaintiff, Mrs. Parker, and Officer Santos in the driveway of 121 Lillian Avenue. Plaintiff contends that he was never in arm's reach of his mother at "any time," and that he did not attempt to make contact with Mrs. Parker or grab her handbag. (ECF Nos. 40-1 at ¶ 1; 40-6 at 46-47.) Moreover, Plaintiff denies inadvertently striking Officer Santos. (ECF Nos. 40-2 at 5-6; 40-6 at 47.) By contrast, Defendants claim Plaintiff did attempt to apprehend his mother's handbag and then swung at Mrs. Parker, but instead hit Officer Santos in the face. (ECF No. 39-3 at 1-2.) According to the witness statements submitted in support of the Defendants' Motion for Summary Judgment, Plaintiff reached around Officer Nardella to grab his mother's handbag, and when Officer Nardella started pushing Plaintiff to keep him away from his mother, Plaintiff then extended his hand to punch Mrs. Parker, but instead struck Officer Santos in the face. (ECF Nos. 39-8, 39-9, 39-10.) Defendants further identify that Plaintiff admitted in his Notice of Claim (ECF No. 39-11) to grabbing his mother's arm, attempting to prevent her from walking away. (ECF No. 41 at 5.)

In the body camera footage of the dark driveway, officers can be heard saying, "John, relax," upon Mrs. Parker's exit from her vehicle (ECF No. 40-7.) Though not much is visible in

the dusk, there is rapid and audible shuffling from Officer Santos' body camera, and from Officer Seaman's body camera, police can be heard saying towards Plaintiff and his mother, "No, no, stop, stop, stop." (ECF No. 40-7.). Plaintiff then exclaims "Don't you-," and officers descend upon the driver's side of the car where Parker, his mother, and officers Santos and Nardella were. (ECF No. 40-7.) From Officer Santos' perspective, after Plaintiff says, "*Don't you-,*" there is an audible thud, and the body camera shakes violently. (*Id*.) As Officer Seaman rushes towards the car, he says "*Watch out, watch out, get out of the way*." (*Id*.) Meanwhile, Officer Santos, amid a physical altercation with Plaintiff, says, "*You f*** man ... bullsh*t ... f*** outta here ... you f***ing ... f*** outta here*." (*Id*.) Having arrived at the front of the car, Officer Seaman asks, "*Who's got cuffs*," to which another unidentified officer replies, "*I got cuffs, I got cuffs*." (*Id*.)  At this point, an officer shines a flashlight on the scene, and Officer Santos swings towards Plaintiff as he is brought to the ground, hitting him at least three times. (*Id*.) Plaintiff shouted back: "*You gonna punch me in my face*," to which Officer Santos replied, "*You bust in my face, you punched me in my f***ing face - let me go, move*!" (ECF No. 40-7.) As the officers try to restrain Plaintiff, Officer Santos continues to cry out, "*You punched me, you motherf***er,*" while Plainitff bemoans for all officers to "*Get the f*** off [him].*" (*Id*.) Officers implore Plaintiff to stop resisting, and,  as the clamor persists, Plaintiff calls out from the ground, "*He's still kicking me! You're just gonna let him kick me and punch me?*" (*Id*.) Officers finally subdue Plaintiff, and Officer Seaman explains to Plaintiff that he was fighting the officers, to which Plaintiff replied, "*I didn't fight nobody*." (*Id*.)

What happens after the police secured Plaintiff is also hotly contested. Defendants claim that Officer Santos only came into contact with Plaintiff *before* officers handcuffed and subdued him and deny that Officer Santos ever struck Plaintiff *after* police had restrained him. (ECF Nos. 41 at 3-4; 41-1 at ¶¶ 2-3, 5). By contrast, Plaintiff contends Officer Santos struck and assaulted

him *after* he was handcuffed on the ground, proffering the body camera footage as corroboration (ECF Nos. 40-1 at ¶ 2; 40-2 at 5-6). Plaintiff additionally asserts that it took four officers to restrain Officer Santos from laying any further blows upon him, while Plaintiff was "handcuffed and non-threatening." (ECF No. 40-2 at 5-6.) Defendants contend in reply that the officers only had to hold Santos back *before* they fully subdued Plaintiff. (ECF No. 41 at ¶¶ 3, 6.) After Plaintiff was handcuffed and lying on the ground, the body camera footage further shows Officer Santos lean over between two officers and say to Plaintiff, "Is that what you wanted? Is that what you wanted?" Officer Santos then lunges at Plaintiff, pushing past fellow officers who had been at ease, and strikes Plaintiff with at least one punch and one kick. (ECF No. 40-7.) The commotion picks up again, with multiple officers shouting Officer Santos' name and moving to pull him away from Plaintiff as they yell for the officer to stop. (*Id*.) Santos relents, and Officer Seridge takes him into the street to cool down and examine the right side of Officer Santos' face where Plaintiff had seemingly struck him (*Id*.)

As Officer Santos walks into the street cursing, Plaintiff asks, "*Y'all gonna let him keep doing that*," to which Officer Seaman responds, "*John, do me a favor: shut up.*" (*Id*.) With officers hoisting him off the ground, Plaintiff repeatedly invites police to look at his face (*Id*. at 4:23 - 4:34). Officers escort a handcuffed Plaintiff to the end of the driveway and into the street, where Plaintiff sees Officer Santos and says, "*Come on, Santos - I got an amputated foot.*" (*Id*.) Officer Santos replies with, "*Shoulda thought about that*," and Plaintiff questions, "*I shoulda thought about what? After you punched me in the face?*" (*Id*.) Officers then load Plaintiff into a police car. (*Id*.) Plaintiff was arrested and charged with attempted grand larceny in the fourth degree, resisting arrest, attempted assault in the third degree, assault in the third degree and detained on an open bench warrant. (ECF No. 39-2 at ¶ 4(l).) These charges were adjourned in contemplation of

dismissal. (*Id.* at ¶ 4(n); ECF No. 1 at ¶ 28.)  Plaintiff claims that Officer Santos' alleged assault has caused "serious and permanent personal injuries." (ECF No 40-1 at ¶ 6.) In his deposition, Plaintiff claimed that the incident left him with nerve damage in his left hand, requiring therapy and making it susceptible to cramps and regular twitching. (ECF No. 40-6 at 52-55.) He additionally claimed that nerve damage in his left eye has forced him to wear glasses since the attack, and that he has had surgery for a titanium flex rod placed in his neck. (*Id.* at 56-63.) However, Defendants contend, relying on Plaintiff's deposition, that no medical evidence has causally related these injuries to the incident with Officer Santos (ECF No. 40-6 at 62), because Plaintiff could not proffer a medical diagnosis connecting the injuries in his hand, eye, and neck to the altercation with police. (ECF No. 41-1 at ¶ 6.)

## II.    **Procedural History**

Plaintiff originally commenced this action against Defendants on December 11, 2019, alleging: (i) violations of his Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, arising from the altercation between him and Officer Santos, (ii) negligent hiring, training, and supervision of Officer Santos and other responding officers on the part of the Incorporated Village of Freeport and its Police Department, and (iii) malicious prosecution on the part of the Incorporated Village of Freeport. (ECF No. 1 at ¶¶ 2, 5, 12, 22, 27.) Plaintiff specifically alleges: (i) that responding officers "unlawfully arrested and unlawfully restrained" him, and that Officer Santos attacked the plaintiff before and after other officers had pulled him away from John Parker, "all… without justification or excuse in fact or in law" (ECF No. 1 at ¶¶ 13-15); (ii) that the Incorporated Village of Freeport and its Police Department "knew or should have known that the aforementioned defendant officers were of vicious propensity," and that the Incorporated Village of Freeport and its Police Department "could have reasonably anticipated the dispositions of the…

8

defendant officers would likely result in injury to others" (ECF No. 1 at ¶¶ 23-24); and (iii) that the arrest, underlying the proceedings commenced by the defendants and terminated favorably to Plaintiff, was made with actual malice but without probable cause. (ECF No. 1 at ¶¶ 27-29.) Defendants answered the Complaint on February 3, 2020. (ECF No. 8.)

On May 29, 2020, Magistrate Judge Shields adopted the parties' proposed Phase I discovery deadlines (ECF No. 10), but additionally: (i) directed counsel to submit a joint status letter on October 9, 2020 setting forth all discovery taken and stating with particularity, all discovery necessary and dates for completion thereof, for the matter to be trial or dispositive motion practice ready, and (ii) scheduled an in-person status conference for October 13, 2020. (*See* Electronic Order dated May 29, 2020.) On October 20, 2020, the Court amended the discovery schedule to have fact-finding completed by December 30, 2020, and to have dispositive motions initiated by January 29, 2021, additionally requiring counsel to submit a joint status letter by December 22, 2020, which would include a request for a settlement conference if the parties so desired. (*See* Electronic Order dated October 20, 2020.) The Court then extended fact discovery to March 30, 2021, dispositive motion initiations to April 29, 2021, and the joint status letter to March 22, 2021. (*See* Electronic Order dated January 13, 2021.) On March 23, 2021, the deadline for expert discovery was extended to June 1, 2021, and the dispositive motion deadline was extended to June 30, 2021. (*See* Electronic Order dated March 23, 2021.) On June 10, 2021, the parties appeared for a Status Conference before the undersigned[2] regarding discovery status; fact and expert discovery were extended to July 31, 2021, and the Final Pretrial Conference before the undersigned was set for August 30, 2021. (ECF No. 16).

---

[2] This case was reassigned from Judge Shields to undersigned on May 24, 2021. (*See* Electronic Order dated May 24, 2021.)

The parties submitted their Joint Pretrial Order ("JPTO") on August 26, 2021. (ECF No. 17). At the Pretrial Conference on September 13, 2021, Plaintiff requested, and was granted, a short adjournment to revise and finalize the JPTO. (ECF No. 19.) The Court set another Pretrial Conference for October 7, 2021, and marked the revised JPTO for filing on October 5, 2021. (*Id.*) On October 21, 2021, Plaintiff requested another extension, which the Court granted and set a Pretrial Conference for November 15, 2021, and a filing deadline on the revised JPTO for November 8, 2021. (ECF No. 20.) The undersigned approved of the parties' JPTO of November 22, 2021, and returned the action to the District Court for final disposition. (ECF No. 22.) However, the Court, considering: (i) the backlog of civil cases due to the COVID-19 pandemic, (ii) the difficulties of holding in-person proceedings at the time, and (iii) the priority of its criminal docket, referred this action to the Trial Ready Rapid Mediation Pilot and ordered the parties to notify the Court of their efforts in finding a mediator by March 2, 2022. (*See* Electronic Order dated January 31, 2022.) The parties ultimately adjourned their first Mediation scheduled for September 22, 2022, because Plaintiff's counsel had stopped practicing the law and was not responding to Plaintiff's requests for his case file. (ECF Nos. 25, 29.) Defendants' counsel offered to provide Plaintiff with courtesy copies of his case file, and the parties agreed to continue mediation while plaintiff looked for new counsel. (ECF Nos. 27, 29.)

At the Status Conference before the undersigned on February 15, 2023, Plaintiff appeared *pro se* and advised the Court that he had not retained new counsel and would not be reopening discovery. (ECF No. 34.) The undersigned marked the case as trial ready and referred it back to Judge Seybert for trial scheduling, considering the case had returned from mediation as unsuccessful. (ECF No. 34; Electronic Order dated February 15, 2023.) At the July 26, 2023, Status Conference before Judge Seybert, the parties entered into a briefing schedule for anticipated

dispositive motions (ECF No. 36), and on October 24, 2023, Plaintiff's new counsel filed a Notice of Appearance. (ECF No. 37.) Defendants filed their Motion for Summary Judgment on all Counts asserted in the Complaint on December 27, 2023 (ECF No. 39), and Plaintiff's Response in Opposition (ECF No. 40), as well as Defendants' Reply in Support (ECF No. 41). On April 19, 2024, Judge Seybert referred Defendants' Motion to the to the undersigned for a Report and Recommendation ("R&R"). (*See* Electronic Order dated April 19, 2024.)

### III.    The Parties' Contentions

####    A.    Defendants' Motion for Summary Judgment

In support of their Motion for Summary Judgment, Defendants argue: (i) the claims against the Village must be dismissed, (ii) Plaintiff's state law claims are barred by the statute of limitations, (iii) that the doctrine of qualified immunity bars Plaintiff's claim against Officer Santos, (iv) Plaintiff's claim for negligent hiring, training, discipline, and supervision must be dismissed because Officer Santos was acting within the scope of his employment, (v) Plaintiff's claim for malicious prosecution must be dismissed, (vi) the claims against the Freeport PD must be dismissed, and (vii) Plaintiff cannot recover punitive damages against the Village. (ECF No. 39-3 at i.) *With respect to the first point*, Defendants argue that Plaintiff has failed to proffer evidence of the Village engaging in an unconstitutional policy, custom, or practice. (ECF No. 39-3 at 3.) Specifically, Defendants posit that a single officer's alleged constitutional violations in an isolated incident do not make the Village vicariously liable for – and cannot demonstrate at large – an unconstitutional municipal pattern or practice under the Supreme Court's decision in *Monell v. Dept. Social Services*, 436 U.S. 658, 691 (1978) ("*Monell*") and the Second Circuit's decision in *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) ("*Ricciuti*"). (*Id.* at 4-5.) Defendants argue Plaintiff's Complaint does not even reference a policy or custom on the Village,

11

and in the Pretrial Order, Plaintiff conceded that the Complaint failed to state a *Monell* claim against the Village, warranting dismissal. (ECF Nos. 39-3 at 5; 39-6 at ¶ 7(p).)

*As to the second point*, Defendants argue the statute of limitations on Plaintiff's state law claims ran on November 7, 2019, however, Plaintiff only filed this action on December 11, 2019, and therefore, as Plaintiff conceded in the Pretrial Order, and pursuant to CPLR §§ 215 and 9802, Defendants contend the statute of limitations bars these claims (ECF Nos. 39-3 at 6-6; 39-6 at ¶ 7(m).) *Third*, Defendants contend the doctrine of qualified immunity bars Plaintiff's claims against Office Santos because Officer Santos' actions were "not only reasonable, but should be expected" as "[P]laintiff was lunging toward his mother and attempting to punch her but instead punched P.O. Santos in the face," and therefore "was a threat to the safety of the officers present and to [Plaintiff's] own mother." (ECF No. 39-3 at 7.)[3] Defendants maintain that "it certainly is not reasonable to expect an officer to not strike back after being punched in the face," contending that one of the main factors in analyzing the merits of constitutional excessive force is "whether the suspect poses a threat to the officers or others." (ECF No. 39-3 at 6-7) (citing *Graham v. Conner*, 490 U.S. 386, 396-97 (1989)). Defendants emphasize that from the perspective of a "reasonable officer at the scene," Officer Santos was justified in defending himself and others amid the "tense, uncertain, and rapidly evolving" circumstances that Plaintiff aggravated. (ECF No. 39-3 at 7) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Defendants further contend that Officer Santos' conduct did not violate an established statutory or constitutional right which a reasonable officer at the scene should have discerned. (ECF No. 39-3 at 8.) Specifically, Defendants claim that, after being punched, Officer Santos acted in self-defense and subdued Plaintiff to effectuate an arrest

---

[3] Plaintiff denies reaching for his mother's handbag or inadvertently striking Officer Santos. (ECF Nos. 40-1 at ¶ 1; 40-6 at 46-47; 40-2 at 5-6; 40-6 at 47.)

for assault, such that it was objectively reasonable for Santos to believe his conduct did not contravene an established right. (*Id*. at 9-10) (citing *City of Escondido, California v. Emmons*, 586 U.S. 38, 43-44 (2019)). To this end, Defendants claim even if the constitutional right is clearly established here, no law could have unequivocally notified Officer Santos or a reasonable official in his place that his retaliation impermissibly violated Plaintiff's general right to be free from excessive force, warranting summary judgment in favor of Defendants on qualified immunity grounds. (*Id.* at 9.)

*Fourth*, Defendants contend that Plaintiff's failure to provide a proper Notice of Claim warrants the dismissal of his claims for negligent hiring, training, discipline, and supervision pursuant to New York General Municipal Law ("NYGML") §§ 50-e and 50-i. (ECF No. 39-3 at 10-11.) Defendants additionally contend that New York State law mandates the dismissal of negligent hiring, training, discipline, and supervision claims when the defendant acts within the scope of his employment, and, as Plaintiff has conceded in the Pretrial Order, Officer Santos was acting within the scope of his employment. (*Id.* at 11; 39-6 at ¶ 7(o).) *Fifth*, Defendants argue Plaintiff's claims for malicious prosecution must be dismissed because, as also acknowledged in the Pretrial Order, the criminal charges against Plaintiff were adjourned in contemplation of dismissal ("ACOD"), which is not a "favorable determination" for the purposes of a malicious prosecution. (ECF No. 39-3 at 11-12.) Defendants posit that acceptance of an ACOD precludes civil action against officers and municipalities for malicious prosecution. (*Id*. at 12) (citing *Freedman v. Monticello Police Department*, 01 Civ 0119 (NRB), 2003 WL 135751 (S.D.N.Y. 2003) (Buchwald, J.)). Defendants further note an element of malicious prosecution is "termination in favor of the accused," and, while ACOD is not an admission of guilt or a conviction, it is not

considered to be "termination in favor of the accused" and does not settle the question of the accused's guilt. (*Id*.)

*Sixth*, Defendants maintain that the claims against the Freeport PD should be dismissed because, under New York law, administrative arms of a municipality do not have a legal identity separate and apart from the municipality and thus cannot be sued, and the Freeport PD is an administrative arm of the Village, and therefore, has no capacity to be sued. (*Id*. at 12-13.) *Finally*, Defendants argue Plaintiff cannot recover punitive damages against the Village, as state entities and political subdivisions are not subject to punitive damages. (*Id*. at 13) (citing *Sharapata v. Town of Islip*, 56 N.Y.2d 332 (1982)).

###    B.    Plaintiff's Opposition

In his Opposition, Plaintiff argues: (i) there are material issues of fact precluding summary judgment at this stage of the litigation, (ii) Defendants "clearly violated [Plaintiff's] established constitutional right," (iii) Officer Santos is not protected by the doctrine of qualified immunity because his act of striking Plaintiff while Plaintiff was handcuffed and subdued was objectively unreasonable, and (iv) that punitive damages may still be available against Officer Santos. (ECF No. 40-2 at 5, 7, 10, 14.) *First*, Plaintiff contends there is an issue of material fact as to whether he inadvertently struck Officer Santos. (*Id*. at 5.) Plaintiff maintains the "baseless and unfounded claim" that he struck Santos "is used only as a pretext to the Defendant officer's actions in an effort to afford him qualified immunity." (*Id*.) In making this argument, Plaintiff relies on his deposition wherein he denied striking Santos (ECF No. 40-6 at 46-47) and contends, this disagreement between the parties alone should warrant denial of Defendant's Motion for Summary Judgment. (ECF No. 40-2 at 6.) Plaintiff asserts Officer Santos exercised excessive force "*after the* [*p*]*laintiff*

*was already restrained and handcuffed and no longer a threat*" such that there is no reasonable or lawful basis upon which to afford Santos qualified immunity. (*Id*.) (emphasis in original).

*Second*, Plaintiff contends that "Defendants violated [his] clearly established constitutional right to be free from excessive force when he was assaulted by Defendant, [Officer Santos], after Plaintiff was already detained and handcuffed on his stomach, presenting no threat to any of the officers present." (*Id*. at 10). Plaintiff relies on the body camera footage, "crucially omitted from Defendants' narrative," as evidence that "vividly captures this unjustified use of force" (*id*. at 7), and also notes that "comments from the other officers present… further attest to the non-aggressive, subdued state of the Plaintiff." (*Id*.) Plaintiff maintains that under the Fourth Amendment, "it is well established that the use of excessive force during an arrest is constitutionally prohibited" (*id*. at 9) (citing *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002), and "the use of force upon an individual already handcuffed, and thus presenting no threat of flight or possible harm to anyone in the area, constitutes excessive force." (*Id*. at 9-10) (citing *Tracey v. Freshwater*, 623 F.3d 90 (2d Cir. 2010). To this end, according to Plaintiff, Defendants "should have known" that striking a "handcuffed and subdued" Plaintiff violated his constitutional rights. (*Id*. at 10.)

*Third*, Plaintiff argues Officer Santos' conduct was "neither reasonable nor within the bounds of established legal standards" (*id*. at 10), and that to grant Santos qualified immunity here "would set a dangerous precedent… condoning gross misconduct under the guise of law enforcement." (*Id*. at 11.) Plaintiff contends that since he was "arrested, subdued, and handcuffed" when Officer Santos struck him, the severity of Plaintiff's underlying crime, the claim that Plaintiff posed a threat to officers, or that Plaintiff was trying to evade arrest are all irrelevant (*id*. at 12-13), as no reasonable jury could conclude that it was reasonable for Santos to think he was not in

contravention of the Fourth Amendment when he struck Plaintiff after he was cuffed and subdued. (*Id*. at 12.)

Plaintiff additionally argues the actions of other officers in body camera footage, "which the Defendants have conveniently ignored" (*id*. at 10), "put to rest any argument regarding the reasonableness of the force used by [Officer Santos]." (*Id*. at 13). Specifically, Plaintiff identifies officers shouted "Santos, stop" while stepping between Santos and the "handcuffed, subdued" Plaintiff. (*Id*.) Plaintiff argues that defendants' proffered precedent is distinguishable, as in *City of Escondido, California*, officers used force while making an arrest, whereas here, officers supposedly engaged in force after plaintiff was restrained (ECF No. 40-2 at 14). *Fourth*, Plaintiff notes that Defendants premised their argument against punitive damages only as to the Village and the Freeport PD, and not against Officer Santos individually. (*Id*.) Plaintiff maintains punitive damages against the Officer Santos are available and suggests that such a reward may be integral to the civil action's remedy. (*Id*. at 14-15.)

### C.   <u>Defendants' Reply</u>

In their Reply, Defendants direct the Court to Plaintiff's Notice of Claim (ECF No. 39-11), which states that Officer Santos only begun striking when Plaintiff grabbed Mrs. Parker's arm to keep her on the scene, and that police only had to pull Officer Santos off Plaintiff *before* they handcuffed and subdued him. (ECF No. 41 at 3.) Defendants further charge that Plaintiff's "feigned factual issues" in his Opposition to Summary Judgment cannot present an issue of triable fact because there is no affidavit or sworn testimony from Plaintiff averring Officer Santos struck him while handcuffed, nor are there any explanations for the inconsistencies between the Notice of Claim and the Opposition. (*Id*. at 4.) Plaintiff's denial of grabbing his mother's arm, according

to Defendants, "does not raise a credible issue of fact sufficient to defeat a motion for summary judgment." (*Id.* at 5.)

In an adamantine fashion, Defendants contend that the body camera footage does not show Officer Santos jumping onto and striking a "handcuffed and subdued" Plaintiff. (*Id.* at 4.) Defendants insist they have not ignored the footage, rather, they acknowledged it in their Declaration of Support for Summary Judgment by referencing the Pretrial Order, which lists all body camera footage. (*Id.* at 5.) Defendants reiterate that Officer Santos was justified in defending himself and others after Plaintiff struck him; and just because officers had to separate Santos from Plaintiff does not suggest Santos' conduct was clearly unlawful. (*Id.*) Furthermore, "[a]s the body camera videos clearly demonstrate," Defendants argue Plaintiff's conduct created a "very tense and confrontational setting," threatening the officers and his mother. (*Id.* at 6-7.)[4] Amid the "seemingly tense and uncertain environment" seen through the body camera videos, Defendants contend that "it was objectively reasonable for [Officer Santos] to believe his acts did not violate any constitutional right of the [P]laintiff," thus warranting the application of qualified immunity to Santos. (*Id.* at 7.)

## DISCUSSION

### I.    Standard on a Motion for Summary Judgment

In order to obtain summary judgment, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

---

[4] Defendants specifically quote Plaintiff from the footage saying, "I'm not afraid of nothing, I've been to jail before, I can fight," "If you don't lock her up, you're going to have a bigger problem," and that the police should "call 20 more." (*Id.* at 6.)

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to *identify* whether triable issue of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). *Au* fond, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

Viewing the facts presented here in the light most favorable to Plaintiff, the undersigned finds: (i) material issues of fact remain for trial on Plaintiff's claim of Fourth Amendment violations, (ii) Plaintiff's *Monell* claim against the Village and the Freeport PD fails as a matter of

law, (iii) Plaintiff's claim for negligence in the hiring, training, discipline and supervision of police officers fails as a matter of law, and (iv) Plaintiff's claim for malicious prosecution fails as a matter of law. Therefore, the undersigned respectfully recommends Defendants' Motion for Summary Judgment be granted as to Plaintiff's *Monell*, negligent hiring/supervision, and malicious prosecution claims, only, and denied as to the alleged Fourth Amendment claims.

## II.    <u>Fourth Amendment Violations and Qualified Immunity</u>

Defendants argue that the doctrine of qualified immunity bars Plaintiff's claims against Officer Santos for violations of Plaintiff's Fourth Amendment rights. *See* ECF No. 39-3 at 6-10. Plaintiff counters: (i) there are still questions of material fact precluding summary judgment on Plaintiff's Fourth Amendment claims, (ii) Officer Santos violated Plaintiff's Fourth Amendment rights, (iii) and Officer Santos' striking of a "subdued and handcuffed" Plaintiff was "objectively unreasonable." *See* ECF No. 40-2 at 5-7, 10-12. The undersigned analyzes the merits of each contention below.

Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Kelsey v. County of Schoharie,* 567 F.3d 54, 60-61 (2d Cir. 2009). Thus, the Court must consider (1) whether the official violated a statutory or constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022); *Tracey v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010). *As to the first consideration*, the Fourth Amendment prohibits a police officer's unreasonable and therefore excessive use of force in effectuating an arrest. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989); *Tracy*, 623 F.3d at 96. Under this test of objective

reasonableness, *Graham*, 490 U.S. at 397, the inquiry weighs the particular facts and circumstances of the disputed incident to balance the plaintiff's Fourth Amendment interests against the concerns of law enforcement. *Harrison v. Inc. Vill. Freeport*, 498 F.Supp.3d 378, 394 (E.D.N.Y. 2020); *Amnesty Am. v. Town W. Hartford,* 361 F.3d 113, 123 (2d Cir. 2004). The Court makes this inquiry not with the benefit of hindsight, but "from the perspective of a reasonable officer on the scene," *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006), acknowledging "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Some factors to shepherd this inquiry chiefly include (1) the nature and severity of the arrest's underlying crime, (2) whether the suspect poses a threat to officers and those in the area, and (3) whether the suspect resisted arrest or attempted to evade officers. *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

In assessing particular circumstances from the perspective of a reasonable officer, a dispute in fact does not necessarily preclude summary judgment on excessive force. *Tracy*, 623 F.3d at 97. For instance, in *Mesa v. City of New York*, plaintiff made contact with an officer conducting crowd control; the parties disputed whether she intentionally lashed out or was merely pushed into the officer. 2013 WL 31002 at *20 (S.D.N.Y. Jan. 3, 2013). Nonetheless, it was not unreasonable for the defendant officer to subdue her, considering that in the tumult of the crowd, the lunging plaintiff seemed to require some sort of restraint, even if she ultimately did not. *Id*. at *19-20 ("It makes no difference that [plaintiff] did not, in actuality, hit [defendant], so long as it was reasonable for the officers who detained her to perceive that some sort of forcible contact had occurred between the two."); *see also Smith v. City of New York* 2021 WL 4267525 at *2-3, 6-8 (S.D.N.Y. Sept. 20, 2021) (where officers reasonably effectuated plaintiff's arrest in a physical

altercation after the plaintiff "in a loud, combative, and antagonistic manner…thrusted his arms in the air" in the direction of an officer, appearing to strike him in the chin). A plaintiff's abrasive and threatening behavior could also compel an officer to take action out of a reasonable concern for the safety of others. In *Lopez v. Gerace*, 2023 WL 7281653 (N.D.N.Y. Nov. 3, 2023), a "highly agitated" plaintiff, "demonstratively walking back and forth," shouting at officers, and removing jewelry seemingly in preparation for a fight, lunged at and came within two feet of an officer. *Id.* at *2-5. Defendant, unsure whether plaintiff was going for a beer can in front of the officer or charging to attack, made the "split-second decision" to punch plaintiff in the face and tackle him to the ground before plaintiff ever made contact with either the can or the officer. *Id.* at *5. The Court found the defendant-officer acted with reasonable force. *Id.* at 11. Officers had tried to ease the situation amid plaintiff's threatening postures, and when this tension seemed to erupt with plaintiff's sudden movement towards an officer, defendant acted with a legitimate concern for the safety of his partner. *Id.* at 10-11.

*As to the second consideration*, the Court focuses on "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Though an officer may violate an established right in the circumstances he confronted, the officer can still be entitled to qualified immunity if it was objectively reasonable of him to believe his conduct did not violate that right. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). Since the inquiry on excessive force is fact-intensive, the Court must define the clearly established right with specificity and definiteness, such that a reasonable official in the defendant's place would know he was violating it. *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019); *Kisela v. Hughes*, 584 U.S. 100, 105 (2018). That does not necessarily mean there needs to be precise precedent on

point, "but existing precedent must place the statutory or constitutional question beyond debate." *Lennox v. Miller*, 968 F.3d 150, 156-57 (2d Cir. 2020) (internal quotations omitted); *Terebesi v. Torreso*, 764 F.3d 217, 237 n.20 (2d Cir. 2014) ("Some measure of abstraction and common sense is required with respect to police methods[.]").

It is beyond question that the use of significant and "entirely gratuitous" force against a restrained arrestee who is not resisting and does not threaten the safety of officers or others is unreasonable and therefore excessive. *Tracy*, 623 F.3d at 99 n.5; *Lennox*, 968 F.3d at 157; *Jones*, 963 F.3d at 225. The Second Circuit has articulated this principle on multiple occasions across a variety of fact patterns and methods of force application. *See Tracy*, 623 F.3d at 98 (holding that a jury could find that the use of pepper spray against a handcuffed and unresisting plaintiff constituted excessive and gratuitous force); *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (vacating summary judgment for an officer who allegedly shoved a handcuffed plaintiff headfirst into a police car, striking her head on the metal frame in the process); *Weather v. City of Mount Vernon*, 474 Fed.Appx. 821, 824 (2d Cir. 2012) (where no reasonable officer would believe that twisting a compliant plaintiff's arm behind his back and shoving him into a brick wall was a lawful use of force); *Simcoe v. Gray*, 577 Fed.Appx. 38, 40 (2d Cir. 2014) (denying summary judgment amid disputes over whether officers yanked plaintiff's arm and smashed his head into the ground even though he was not resisting); *Outlaw*, 884 F.3d at 367 (where the Court affirmed a jury's verdict on appeal, reasoning that "no competent police officer could have failed to comprehend that [the constitutional prohibition against use of excessive force in making an arrest] would encompass repeatedly beating an unresisting, supine, jaywalking suspect with a stick").

"Restrained" arrestees are typically in handcuffs and encompassed by officers, making no or ceasing evasive attempts. *Estate of Jaquez v. City of New York*, 104 F.Supp.3d 414, 434-35

(S.D.N.Y. 2015) ("[R]easonable jurors applying their common sense could determine that it was objectively unreasonable to shoot Mr. Jaquez in the back of the head when he had already been shot at least four times, was surrounded by a team of officers suited up in their ballistics gear, and, even if he somehow maintained possession of the knife, was merely pushing up from the ground"); *Bryant v. Meriden Police Dept.*, 2017 WL 1217090 at *15 (D. Conn. Mar. 31, 2017) (holding it as clearly established that officers could not inflict significant force upon a handcuffed arrestee surrounded by multiple officers); *Watson v. Grothkopp*, 2019 WL 3431104 at *6 n.9 (E.D.N.Y. Sept. 14, 2012) (finding that plaintiff's snide remarks towards police did not sanction an officer to punch plaintiff in the face where plaintiff had his hands on the ground, made no attempt to flee, and was encircled by three officers). More recently, *Lennox* articluated that *Tracy*'s holding still applies in cases of apparent excessive force featuring crude, physical altercations. In *Lennox*, an officer "had no trouble" handcuffing plaintiff and slammed her to the ground. *Lennox*, 968 F.3d at 153. The officer then crushed plaintiff under both knees, causing significant pain. *Id*. Relying on *Tracy*'s progeny, the Second Circuit reiterated "that it is impermissible to use significant force against a restrained arrestee who is not actively resisting." *Id*. at 157 ("Because a reasonable jury could find that the force used by [defendant] was significant and that [plaintiff] was not resisting when such force was used, we cannot say, as a matter of law, that [defendant] did not violate clearly established law.").

Here, Plaintiff's Complaint "can be read to allege that [Officer Santos] exceeded Fourth Amendment constraints in [two] different ways[.]" *Tracy*, 623 F.3d at 96; ECF No. 1 at ¶ 14. *First*, that Officer Santos attacked Plaintiff without justification when Mrs. Parker exited her car (hereafter, the "First Interaction"). *Second*, that Officer Santos assaulted Plaintiff after officers

23

subdued Parker and placed him in handcuffs (hereafter, the "Second Interaction"). As stated, Officer Santos disputes Plaintiff's account of the facts behind both of those allegations.

A.    **The First Interaction**

*With respect to the First Interaction*, the undersigned concludes that Officer Santos acted reasonably and did not use excessive force in violation of the Fourth Amendment. From Santos' perspective, and as Officers Nardella and Seridge affirmed in their witness statements, Plaintiff had his mother bound in an intense verbal melee from the time officers arrived on scene, belligerently shouting his position at both her and police. *See* ECF Nos. 39-8; 39-9. Even after officers had explained to him it was a civil matter about which they could do nothing, neither Plaintiff nor his mother broadcasted an intent to acquiesce and instead chose to sustain the war of words over $140.00. Long before the altercation over Mrs. Parker's handbag, officers voiced their concerns that Plaintiff was going to break her car door or smash her window when he asked, "You want me to break the f***ing window?" *See* ECF No. 40-7. Whether or not Plaintiff intended to act on these statements is immaterial where officers on the scene interpreted these threats gravely and anticipated violence. As with the shouting *Lopez* plaintiff who seemed to be preparing for a fight, Plaintiff's demonstrative conduct here created a combative and uncertain environment that reasonably put officers on a heightened alert for conflict ahead of the struggle by Mrs. Parker's car. Plaintiff further threatened that his mother would not make it into her own home before surrendering the money. Once again, it does not matter if Parker intended these words in jest or for show. Rather, the query is on how a reasonable officer would perceive this conduct amid the circumstances. Considering that an agitated Parker positioned himself against his mother's car door multiple times and refused to leave even in the presence of multiple officers, Santos and his

24

cohort had reason to believe Parker would use force to stop his mother from leaving the scene, thus posing a threat to her safety and that of those in the vicinity.

Considering these circumstances, the witness statements of Officer Nardella, Officer Seridge, and Mrs. Parker are particularly instructive of the precise sequence of events surrounding the First Interaction. All three place Officers Nardella and Santos standing by Mrs. Parker's car in the driveway as she and her son disputed the money. *See* ECF Nos. 39-8; 39-9; 39-10. According to Officer Nardella's statement, as Mrs. Parker exited her vehicle, Plaintiff "reached around [him] and grabbed [Mrs. Parker's] purse in an attempt to remove it from her person." *See* ECF No. 39-8. Officer Seridge recounts the same occurrence: "As [Plaintiff's] mother attempted to exit her vehicle, [Plaintiff] did attempt to take her purse off her person." *See* ECF No. 39-9. Mrs. Parker further testified that she was "exiting [her] vehicle when [Plaintiff] grabbed [her] handbag." *See* ECF No. 39-10. Officer Nardella and Mrs. Parker additionally claim that Mrs. Parker pushed away from Plaintiff to break his grasp. *See* ECF Nos. 39-8; 39-10. After this, Officer Nardella "interceded and began pushing [Plaintiff] back to keep him away from [Mrs. Parker]." *See* ECF No. 39-8. Officer Seridge affirmed this testimony, observing that "Nardella did grab [Plaintiff] to keep him off [Mrs. Parker]." *See* ECF No. 39-9. Mrs. Parker similarly stated that, after she pushed off Plaintiff, "police then intervened and wrestled [Plaintiff]." *See* ECF No. 39-10. Finally, all three statements maintain that Plaintiff, in attempting to reach around Officer Nardella and strike his mother, punched Santos in the face. *See* ECF No. 39-8 ("[Plaintiff] then made a closed fist and in an attempt to punch his mother, recklessly punched PO Santos in the face[.]"); ECF No. 39-9 ("[Plaintiff] then threw a punch which did strike PO Santos in the face."); ECF No. 39-10 ("[Plaintiff] had extended his right hand in an attempt to punch me but instead struck PO Santos in the face.").

Parker disputes three aspects of this sequence: (i) he denies grabbing or attempting to grab his mother or her purse (ECF No. 40-6 at 46), (ii) he contends that he never attempted to punch his mother (*Id.*), and (iii) he insists he never inadvertently struck Officer Santos (ECF Nos. 40-1 at ¶ 1; 40-2 at 5; 40-6 at 47). However, in Plaintiff's Notice of Claim, his Memorandum in Opposition against Defendants' Motion for Summary Judgment, and his Deposition (and notwithstanding the inconsistencies between the Notice of Claim and the Deposition), Plaintiff does not deny the pushing and shoving Officer Nardella, and the three statements corroborating that fact go uncontested. Thus, even after settling the three disputed facts in favor of Plaintiff – *i.e*., that he did not grab or attempt to grab his mother's purse, did not attempt to punch his mother, and that he did not inadvertently strike Officer Santos – Plaintiff, at the very least, engaged with Officer Nardella in some sort of grapple which an officer in Santos' position could reasonably perceive as a threat to the safety of those around him. *See* ECF No. 41 at 5. Like the interaction in *Mesa*, where the Court found it reasonable for officers to restrain a lunging plaintiff in a tumultuous scene who had just made contact with an officer, here, Santos found himself before an agitated and combative Plaintiff who, by his words and conduct, appeared bent on apprehending his mother and the $140.00 by physical means.

Even if Parker did not intend to seize any part of his mother, his encounter with Officer Nardella in the close quarters of the dark driveway, pinched between a car and hedges, posed an imminent threat to the safety of Officer Nardella and Mrs. Parker, whom an escalation of violence could embroil. Guided by *Lopez*, it was reasonable for an officer to take down a plaintiff who had suddenly moved within close proximity to another officer without even making contact; here, Plaintiff *had* already made contact with Officer Nardella. And, as in *Lopez*, Plaintiff had not shown signs of simmering his temper in the moments before the altercation. Rather, Plaintiff's conduct,

as seen from the perspective of Santos, only increased the tension in the driveway and elicited a forceful response from police who, up until that moment, had attempted to reason with him the entire time they were there. To this end, the undersigned finds Officer Santos acted with reasonable force in taking down Plaintiff after seeing Plaintiff use force against a fellow officer.

> **B.**    **The Second Interaction**

With respect to the Second Interaction, the undersigned finds that there are still material issues of fact in dispute precluding a grant of summary judgment at this stage. The parties specifically dispute whether Officer Santos continued to strike Plaintiff *before* or *after* officers handcuffed and restrained Plaintiff. Affording full credit to Plaintiff's account of the Second Interaction, the undersigned notes a reasonable juror could certainly find that Santos' pushing past officers surrounding Plaintiff and attempting to strike him while Plaintiff was handcuffed and offering no resistance constituted unreasonable force. As laid out above (*see supra*, II. Count I: Fourth Amendment Violations and Qualified Immunity), Second Circuit precedent has clearly established a restrained and complaint arrestee's right to be free from the use of significant force, where qualified immunity cannot shield an officer amid a dispute of fact material to force application. *Tracy*, 623 F.3d at 98; *Simcoe*, 577 Fed.Appx. at 40; *Jones*, 963 F.3d at 225 ("Before the incident at issue here in [August 2018], it was clearly established in this Circuit that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others.").

Here, Santos insists that he only struck Parker before officers had restrained him, and that even if officers pulled him off, it was only before they fully restrained Parker and does not in itself speak to any constitutional violation. *See* ECF No. 41 at 4-5. However, according to Plaintiff, Santos engaged a docile, handcuffed Plaintiff well after the initial struggle in the driveway,

pushing past other officers to deliver further blows. *See* ECF No. 40-2 at 6-7. Moreover, unlike the evidence presented regarding the First Interaction, there is nothing on the record compelling the conclusion that Plaintiff further resisted officers after he was handcuffed. Particularly with the body camera footage, a reasonable jury could find that Parker was restrained and no longer presented a threat, considering he was surrounded by officers and appeared to be in handcuffs. As *Bryant* and *Watson* denote, officers have restrained an arrestee typically when they handcuff and surround him. Furthermore, the footage shows Santos pushing past officers and striking in Plaintiff's direction. To this end, without ruling on the reasonableness of this interaction, a jury could additionally find here that Santos inflicted a significant amount of force upon a restrained and compliant Parker. As *Lennox* held in line with *Tracy*'s reasoning, physical blows against an arrestee who no longer poses a threat to officers or others constitutes an impermissible amount of force – and amid disputes of material fact – such findings should go to the jury. Therefore, the undersigned "cannot say, as a matter of law, that Officer [Santos] did not violate clearly established law," *Lennox*, 968 F.3d at 157; accordingly, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment as to Plaintiff's claim of Fourth Amendment violations against Officer Santos be denied.

### III.   *Monell* Liability

To state a claim against a municipality -- in this instance, the Village -- Plaintiff must adduce certain evidence to prevail on his § 1983 claim: "[A] municipality, such as the [Village], can only be liable under section 1983 if an action taken pursuant to official municipal policy caused the alleged deprivation of plaintiff's rights." *Molina v. New York*, No. 21-CV-3144 (RPK) (JMW), 2023 U.S. Dist. LEXIS 8961, at *19 (E.D.N.Y. Jan. 17, 2023). Specifically, pursuant to the Supreme Court's decision in *Monell*, a plaintiff must demonstrate that conduct pursuant to the

municipality's policy or custom, made by lawmakers or those whose acts fairly represent the official policy, inflicted the alleged harm. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978); *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012) ("*Jones*"). And, "[a]bsent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Id.* at 80; *see also Hall v. New York City Dep't of Corr.*, No. 22-CV-5738 (AMD) (MMH), 2022 WL 17811474, at *2 (E.D.N.Y. Dec. 19, 2022) (quoting *Halperin v. New York City Dep't of Correction*, No. 19-CV- 6266, 2019 WL 6328775, at *2 (E.D.N.Y. Nov. 26, 2019) (dismissing § 1983 claim against DOC and declining to substitute the City of New York as a defendant where the plaintiff did not allege any unconstitutional policy or custom attributable to the City of New York)).

In determining whether there is an unconstitutional policy or custom at play, Second Circuit courts look for (1) a municipality's endorsement of a formal policy, (2) actions of officials who are responsible for establishing the policy that caused the apparent constitutional deprivation, (3) a consistent and widespread practice that, though not officially sanctioned, is readily apparent to a supervising policy maker, or (4) inadequate training of subordinates amounting to the policymakers' deliberate indifference to the rights of those who interact with the subordinates. *Brandon v. City of New York,* 705 F.Supp.2d 261, 276–77 (S.D.N.Y. 2010). In a similar vein, while circumstantial evidence of inadequately trained subordinates can lead to inferences of deliberate indifference at the policy-making level, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) ("*Ricciuti*").

*Ricciuti* featured an amended complaint describing more than a dozen incidents "of alleged, conceded, or adjudicated improper arrests by TA officers from 1975 to 1989" and three reports

detailing chronic shortcomings of the TA's subway policing. *Id*. at 121. Where individual TA officers had punched, threatened, and arrested plaintiffs without cause in the case's underlying events, the Court found there was enough evidence to infer the TA's deliberate indifference, constituting a municipal policy behind those individual beatings. *Id*. at 120-24. Conversely, in *Jones*, though plaintiff produced "instances of reprehensible and at times illegal and unconstitutional conduct by individual officers," nothing demonstrated persistent, abusive conduct among officers over a period of years sufficient to put supervisors and policymakers on notice. *Id*. at 85. Several isolated incidents (some wherein police did not even commit a constitutional infraction) beyond supervisory purview could not sufficiently evince an indifference tantamount to a municipal policy. *Id*. at 84-85.

Here, as Plaintiff concedes in the Joint Pretrial Order ("JPTO") (ECF No. 39-3 at 7(p)), the undersigned finds Plaintiff's *Monell* claim fails as a matter of law. Even if, as Defendants note, Plaintiff's Complaint alleged that a policy or custom of the Village wrought upon Plaintiff a constitutional deprivation, the facts are bereft of evidence or inferences tying the Complaint's underlying incident to that policy. After consideration of Plaintiff's deposition, the voluminous body camera footage, and the parties' respective 56.1 Statements and attached exhibits, the undersigned finds nothing in the record suggests that conduct like that of Officer Santos' on August 9, 2018 was so widespread as to draw the attention of supervising policy makers, nor can the Court draw any inferences from the single incident at 121 Lillian Avenue that the Village so poorly prepared Officer Santos and his fellow subordinates as to render the Village indifferent to the rights of those its officers encountered in similar scenarios. *See e.g., Mineo v. Town of Hempstead*, No. 22CV04092JMAJMW, 2024 WL 1077874, at *6 (E.D.N.Y. Feb. 23, 2024), *report and recommendation adopted*, No. 22CV04092JMAJMW, 2024 WL 1072569 (E.D.N.Y. Mar. 12,

2024) ("*Mineo*") ("As the operative complaint stands, Plaintiff fails to set out any pattern constituting a violation of his § 1983 rights as against the Town. Instead, he states in a conclusory fashion 'that the conduct of the Defendants as complained herein constitutes a pattern of illegal and discriminatory actions aimed at harming the Plaintiff and his family solely in response to the Plaintiff's conduct as a Compliance Officer with the TOH.'"); *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652 at *12, 2015 U.S. Dist. LEXIS 38703 at *41 (S.D.N.Y. Mar. 26, 2015) (finding plaintiff's threadbare allegations that the city had a policy or practice of using excessive force and that it had a custom of inadequately training or otherwise supervising personnel which resulted in violations of her constitutional rights was insufficient under *Monell*); *Jones v. City of Mount Vernon*, No. 22-cv-414 (NSR), 2023 WL 2118026 at *9, 2023 U.S. Dist. LEXIS 27526 at *21 (S.D.N.Y. Feb. 17, 2023) ("*Mount Vernon*") (stating that plaintiff's "boilerplate" allegations that the department's and city's policies and practices were the "driving force" behind the constitutional violation was insufficient to prove causation).

In stark contrast to the multiple reports and documented incidents over a period of years in *Ricciuti* approaching widespread behavior, the events of this isolated incident, construed in the most favorable light for Plaintiff, cannot render the Village liable for any alleged depravation of a constitutional right. As seen in *Jones*, no amount of Officer Santos' apparent depravity can singularly hold the Village liable. Plaintiff does not proffer a history of documented police training and conduct, reports on the Freeport PD demonstrating policing shortcomings effectively sanctioning this type of behavior, or a volume of incidents where officers similarly situated in rank and circumstance acted in a manner similar to Defendant Santos. At bottom, we cannot aggregate this incident to find widespread or indifferent behavior constituting a municipal policy if we have nothing to study beyond the incident itself. *See Mineo*, No. 22CV04092JMAJMW, 2024 WL

1077874, at *7 (collecting cases) ("Plaintiff only describes these Defendants' conduct, without demonstrating or connecting it to an unconstitutional policy, pattern, or custom. Plaintiff's assertions are insufficient to constitute a claim under § 1983.") Accordingly, the undersigned respectfully recommends Defendants' Motion for Summary Judgment as to Plaintiff's *Monell* claim against the Village be granted.

Likewise, the undersigned finds any claims asserted against the Freeport FD should be dismissed because the department is not an entity subject to suit. Pursuant to Fed. R. Civ. P. 17(b), an entity can only be sued in federal court if it would be suable under the laws of the state where it was created. *See Omnipoint Communications v. Town of LaGrange*, 658 F.Supp.2d 539, 552 (S.D.N.Y.2009) (citation omitted) ("*LaGrange*"). In this case, the Court applies New York law to determine who is a proper party in this action. Plaintiff has sued Officer Santos, in his individual and official capacity, the Village and the Freeport PD. In New York, however, departments of a municipality are not suable entities because they are "merely administrative arms of a municipality" that "do not have a legal identity separate and apart from the municipality." *Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y.2002); *see also LaGrange*, 658 F.Supp.2d at 552 (collecting cases); *Rose v. Cnty. of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012) ("The Police Department is an administrative arm of the County[]. Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued.") Therefore, the undersigned finds Freeport PD is an improper defendant in this action, and respectfully recommends it be dismissed. *See e.g., MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010).

IV.     **Negligent Hiring, Supervision, and Training**

As stated, Plaintiff brings claims against Defendants for negligence in the hiring, training, discipline and supervision of police officers. The undersigned finds Plaintiff's failure to comply with New York's Notice of Claim requirements warrants the dismissal of his claims for negligent hiring, training, discipline, and supervision pursuant to New York General Municipal Law ("NYGML") §§ 50-e and 50-i. *See* ECF No. 39-3 at 10-11. Pursuant to NYGML § 50-i, "a plaintiff pursuing litigation against a state county must (1) file a notice of intent to file a claim with the respective county and (2) commence the action within the statute of limitations of 'one year and ninety days after the happening of the event upon which the claim is based.'" *Horton v. Schenectady Cnty.*, No. 821CV983 (LEK)(CFH), 2024 WL 1655385, at *2 (N.D.N.Y. Apr. 17, 2024) (quoting N.Y. Gen. Mun. L. § 50-i). It is well established in this Circuit that New York's notice of claim requirements "apply to state law personal injury claims that are brought in federal court as related to Section 1983 cases[:]" Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement, or to grant permission to file a late notice. To survive a motion to dismiss, a plaintiff must affirmatively plead that a notice of claim was filed. *Id.* (cleaned up) (collecting cases); *see also Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003) ("The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action."). While Section 50-e "enables a plaintiff to apply to a court for leave to serve a late notice of claim," the application "must be made within the statute of limitations of one year and ninety days." *Id.* at *3 (citing N.Y. Gen. Mun. L. § 50-e(5)); *Delaney v. City of Albany*, No. 12-CV-1575, 2014 WL 701637, at *5 (N.D.N.Y. Feb. 24, 2014) ("Courts have discretion to grant requests to

file late notices of claim only up to the statute of limitations period-one year and ninety days from the accrual of the claim.").

Here, the incident upon which Plaintiff's Complaint is based occurred on August 9, 2018, and, while Plaintiff filed his Notice of Claim on November 9, 2018, he did not commence the instant action until December 12, 2019, and failed to plead that a Notice of Claim was filed in his Complaint. *See* ECF No. 1. And, if even the Court disagrees and finds Plaintiff properly complied with state law procedural requirements, the undersigned notes New York State law additionally mandates the dismissal of negligent hiring, training, discipline, and supervision claims when the defendant acts within the scope of his employment, and, as Plaintiff has conceded in the Pretrial Order, Officer Santos was acting within the scope of his employment, such that dismissal of Plaintiff's second claim is nonetheless warranted. *See* ECF No. 39-6 at ¶ 7(o); *see also Poventud v. City of New York,* No. 07 CIV. 3998 DAB, 2015 WL 1062186, at *17 (S.D.N.Y. Mar. 9, 2015) ("Where an employer admits its employee was acting within the scope of his employment, an employer may not be held liable for negligent hiring, training, and retention.").

## V.    Malicious Prosecution

To establish a claim for malicious prosecution under § 1983 and New York law, a plaintiff must allege (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. *Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015). "A Section 1983 malicious prosecution claim also requires a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Buari v. City of New York*, 530 F. Supp. 3d 356, 383 (S.D.N.Y. 2021) (quotes omitted). Prior to 2022, to meet the favorable termination element, a plaintiff in the Second Circuit needed to show

some "affirmative indication of innocence." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018), *abrogated by Thompson v. Clark*, 212 L. Ed. 2d 382, 142 S. Ct. 1332 (2022). However, the Supreme Court has recently rejected Second Circuit precedent on the "favorable termination" element and held that "a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson v. Clark*, —— U.S. ——, 142 S. Ct. 1332, 1341, 212 L.Ed.2d 382, 393 (2022). Rather, "[a] plaintiff need only show that the criminal prosecution ended *without* a conviction." *Id.* (emphasis added).

Here, the undersigned finds Plaintiff's claim for malicious prosecution fails as a matter of law because, as also acknowledged in the Pretrial Order, the criminal charges against Plaintiff were ACOD, which is not a "favorable determination" for the purposes of a malicious prosecution. *See* ECF No. 39-3 at 11-12; *Freedman v. Monticello Police Dep't,* No. 01 CIV. 0119 (NRB), 2003 WL 135751, at *2 (S.D.N.Y. Jan. 17, 2003) (quoting *Singleton v. City of New York*, 632 F.2d 185, 193–94 (2d Cir. 1980) ("It is well settled that in order to maintain an action for malicious prosecution under 42 U.S.C. § 1983 in the Second Circuit, a plaintiff must establish that a prosecution was terminated in his favor. Moreover, it has been held that because a dismissal pursuant to Crim. Proc. Law § 170.55 (an ACD) is 'not the equivalent of a verdict or finding that the defendant is not guilty of the offense charged against him', a plaintiff who has entered into an ACD, cannot maintain a federal § 1983 claim based on a claim of malicious prosecution."); *Singleton*, 632 F.2d at 195 ("To hold otherwise would permit a defendant to relitigate the issue of probable cause by way of a s 1983 action, despite the state court's determination of that issue against him after full and fair consideration of the evidence, thus posing the prospect of harassment, waste and endless litigation, contrary to principles of federalism."). To this end, Plaintiff's acceptance of an ACOD precludes

his civil action against officers and municipalities for malicious prosecution, and, therefore, it is respectfully recommended that Defendants' Motion for Judgment on Plaintiff's claim for malicious prosecution be granted. *See* ECF No. 39-3 at 11-12 (further noting that an element of malicious prosecution is "termination in favor of the accused," and, while ACOD is not an admission of guilt or a conviction, it is not considered to be "termination in favor of the accused" and does not settle the question of the accused's guilt); *Harry v. City of New York*, No. 23-cv-69, 2024 U.S. App. LEXIS 1618, at *4 (2d Cir. Jan. 24, 2024) ("[P]robable cause to prosecute both charges defeats Harry's claim.").

## CONCLUSION

For the reasons stated herein, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's *Monell,* negligent hiring/supervision, and malicious prosecution claims, and **DENIED** as to Plaintiff's Fourth Amendment claims against Officer Santos.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on Counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008)

("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  August 15, 2024

RESPECTFULLY RECOMMENDED,

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge